**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CENTER FOR SCIENCE IN THE PUBLIC INTEREST**, <br>　　1250 I Street NW, Suite 500 <br>　　Washington, DC 20005, <br> <br> **CONSUMER FEDERATION OF AMERICA**, <br>　　1620 I Street NW, Suite 200 <br>　　Washington, DC 20006, and <br> <br> **NATIONAL CONSUMERS LEAGUE**, <br>　　1701 K Street NW, Suite 1200 <br>　　Washington, DC 20006, <br> <br>　　　　　　　Plaintiffs, <br> <br>　　v. <br> <br> **U.S. DEPARTMENT OF TREASURY**, <br> <br> **JANET YELLEN**, in her official capacity as <br> U.S. Secretary of the Treasury, <br> <br> **ALCOHOL AND TOBACCO TAX AND TRADE BUREAU**, and <br> <br> **MARY G. RYAN**, in her official capacity as <br> Administrator of the Alcohol and Tobacco Tax <br> and Trade Bureau, <br> <br>　　　　　　　Defendants. | Case No. 22-2975 <br> <br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.　　Plaintiffs Center for Science in the Public Interest ("CSPI"), Consumer Federation of America ("CFA"), and National Consumers League ("NCL") (collectively, "Plaintiffs") bring this action against the U.S. Department of Treasury; Janet Yellen, U.S. Secretary of the Treasury; the Alcohol and Tobacco Tax and Trade Bureau ("TTB"); and Mary G. Ryan, Administrator of the TTB (collectively, "Defendants").

2.      Plaintiffs seek relief from Defendants' nearly nineteen-year delay in responding to a 2003 petition submitted by Plaintiffs, 66 other organizations, and eight individuals, including four deans of schools of public health. *See Petition to Improve Mandatory Label Information on Alcoholic Beverages ("Alcohol Facts")* (Dec. 16, 2003), https://bit.ly/2Uv4kxt (the "Petition"). The Petition urged TTB to require alcohol labeling with the same basic transparency consumers expect in foods. For alcohol, that means labeling that has alcohol content, calorie, and ingredient information—including ingredients that can cause allergic reactions. *See generally* Petition.

3.      Enhanced transparency in alcohol labeling is a commonsense step that can help address the health and safety concerns related to the consumption of alcohol and would allow consumers to make informed choices about the alcoholic products they purchase.

4.      According to the Treasury Department, which oversees TTB, alcohol "labeling could be an effective means of conveying information relevant to health concerns (for example, calorie content and more detail about alcohol content) to consumers," and "ensuring consumers are informed about the nature of alcohol beverages promotes public health goals." Dep't of Treasury, Competition in the Markets for Beer, Wine, and Spirits at 47–48 (Feb. 2022), https://bit.ly/3wbZchi ("Treasury Report").

5.      Yet, Defendants have failed to take significant action in nearly two decades to address this urgent public health and consumer protection matter. As a result, Plaintiffs' members and supporters have for years been forced to consume alcoholic products without knowing important diet, health, and safety information or possibly forgo them.

6.      To remedy Defendants' years-long unreasonable delay in acting on the Petition, Plaintiffs seek an order from this Court directing Defendants to make a final decision granting or denying the Petition within sixty days.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action is a civil action arising under the laws of the United States.

8.     Venue properly lies in this Court pursuant to, *inter alia*, 28 U.S.C. § 1391(e)(1)(C) because Plaintiffs have their principal place of business in this judicial district.

## PARTIES

9.     Plaintiff CSPI is a non-profit consumer education and advocacy organization headquartered in Washington, D.C., which has worked since 1971 to improve the public's health through better nutrition, safer food, and transparent food labeling. CSPI provides nutrition and food safety information directly to consumers, and has long advocated for legislation, regulation, and judicial rulings to ensure that foods are safe and clearly labeled.

10.     CSPI is supported by grants from foundations and its more than 380,000 members, including donors and/or individuals who receive its health and nutrition newsletter, *Nutrition Action*, which is sometimes received as a CSPI membership benefit. Through its newsletter and online communications, CSPI engages with its members, who provide a substantial portion of the organization's annual financial support and help shape its priorities.

11.     As part of its broader mission, CSPI engages in public education and advocacy related to alcohol labeling and safety. This body of work includes developing and disseminating information to CSPI's members regarding the health risks posed by excessive alcohol consumption and alcohol's contribution to excess calories in the diet.

12.     CSPI also engages in advocacy urging Defendants and Congress to strengthen alcohol labeling laws and regulations.

13.     Indeed, CSPI's work on alcohol labeling goes back to its founding, when, in 1972, it first petitioned TTB's predecessor agency to require ingredient labeling. *See* 70 Fed. Reg. 22,274, 22,276 (Apr. 29, 2005) (recounting history of ingredient labeling rulemaking).

14.     CSPI was a petitioner in the Petition at issue in this case.

15.     Plaintiff CFA is an association of more than 250 nonprofit consumer organizations established to advance the consumer interest through research, advocacy, and education. CFA works to support food policies that promote transparency, empower consumers to make healthy choices, and ensure access to a safe and wholesome food supply.

16.     As part of this effort, CFA has long advocated for more transparent alcohol labeling. CFA has published educational materials to help consumers understand the caloric loads in popular alcoholic beverages, and sought to raise awareness of what constitutes a standard drink.

17.     CFA was a petitioner in the Petition at issue in this case.

18.     Founded in 1899, Plaintiff NCL is America's pioneering non-profit consumer advocacy organization. For nearly 120 years, NCL has worked to promote fairness and economic justice for consumers and workers in the United States and abroad.

19.     To this end, NCL appears regularly before legislatures, administrative agencies, and courts across the country, advocating for the enactment and vigorous enforcement of laws that effectively provide truthful and accurate information to consumers about the products and services they purchase and use. NCL's nutrition and food safety work aims to protect assistance programs, help consumers understand labeling and make informed decisions, and keep companies accountable for the claims made on food products.

20.     As part of that effort, NCL supports and devotes significant resources to ensuring the full and accurate labeling of alcoholic beverages.

21.     NCL was a petitioner in the Petition at issue in this case.

22.     Each of the Plaintiff organizations has members, board members, staff, and/or supporters who have been harmed by Defendants' delay in acting on the Petition and will continue to be harmed so long as Defendants withhold a decision.

23.     For example, Dr. Ted Miller, is a CSPI member. He has been a CSPI donor for approximately 30 years and is a long-time recipient and reader of CSPI's newsletter *Nutrition Action*. Dr. Miller is an internationally recognized safety economist whose primary emphasis areas include substance abuse prevention and control. In that capacity, Dr. Miller and CSPI have directly collaborated on alcohol safety and transparency projects.

24.     Dr. Miller also has diabetes and several food allergies. Because of Defendants' failure to mandate comprehensive alcohol labeling, alcohol labels do not provide Dr. Miller sufficient information to make safe and informed choices about alcoholic beverages.

25.     Dr. Miller manages his diabetes with a meticulously regulated diet. If alcoholic beverages had calorie information, Dr. Miller could and would enjoy integrating those beverages into his diet. However, in the absence of such information, Dr. Miller must choose between largely foregoing alcoholic beverages or putting his health at risk.

26.     He mostly chooses to avoid alcoholic beverages. However, on the rare occasions that he allows himself to consume alcoholic beverages, he does his best to try to use his personal knowledge of the nutritional composition of alcoholic beverages to estimate how much he can safely drink.

27.     However, this is not adequate. Despite Dr. Miller's extensive knowledge about alcoholic beverages, on several occasions where he decided to consume an alcoholic beverage, he misestimated the nutrition information. As a result, his blood sugar levels were high the next day requiring the passage of time and a significant adjustment to his diet to bring them back within normal range.

28.     Dr. Miller also suffers from several food allergies, including allergies to mint and several tree nuts, which are used as flavorings in some alcoholic beverages. In the absence of ingredient labeling, Dr. Miller is unable to determine if alcoholic beverages contain tree nuts or other ingredients he is allergic to. As a result, in the absence of comprehensive alcohol labeling, Dr. Miller must choose between foregoing flavored alcoholic beverages or putting his health at risk.

29.     Dr. Nancy Naomi Carlson, Dr. Miller's wife, is also a long-time CSPI member, donor, and *Nutrition Action* recipient. She has been a *Nutrition Action* recipient for more than 20 years and CSPI donor for approximately 10 years. Dr. Carlson suffers from an allergy to dairy, which is used as an ingredient in some alcoholic beverages. In the absence of ingredient labeling, she is unable to determine if alcoholic beverages contain dairy or a dairy-derivative. As a result, when she consumes alcohol, the lack of comprehensive alcohol labeling puts her at increased risk of suffering an allergic reaction.

30.     These are actual, concrete injuries that are traceable to Defendants' failure to act on the Petition. If Defendants are required to act and make a final decision granting the Petition, Plaintiffs' members and supporters would have adequate information to make safe and informed choices about alcoholic beverages. Alternatively, even if TTB made a final decision denying the

Petition, that would allow Plaintiffs to pursue remedies before the agency and in the courts that are not available so long as Defendants withhold a final decision.

31.     Defendant U.S. Department of Treasury is the federal agency charged with implementing the Federal Alcohol Administration Act ("FAA Act") and the Internal Revenue Code ("IRC"), including their provisions related to alcohol labeling.

32.     Defendant Janet Yellen is the U.S. Secretary of the Treasury and is sued in her official capacity.

33.     Defendant TTB is a bureau under the U.S. Department of Treasury that is responsible for enforcing the provisions of the IRC and FAA Act related to alcohol labeling.

34.     Defendant Mary G. Ryan is the Administrator of the TTB and is sued in her official capacity.

## LEGAL BACKGROUND

35.     Alcohol labeling in the United States is governed by a patchwork of federal legislation with treatment differing depending on the type of alcoholic beverage and that beverage's alcohol content.

36.     The labeling of alcoholic beverages is variously governed by the (a) FAA Act; (b) IRC; and (c) Federal Food, Drug, and Cosmetic Act ("FDCA").

37.     As it relates to alcohol labeling, the FAA Act and IRC are administered by the TTB and the FDCA is administered by the Food and Drug Administration ("FDA").

## I.     TTB's Authority under the FAA Act and IRC

38.     Section 105(e) of the FAA Act sets forth standards for the regulation of the labeling of wine (containing at least 7 percent "alcohol by volume" ("ABV")), distilled spirits,

and malt beverages. *See* 27 U.S.C. § 205(e); *see also* 27 U.S.C. § 211(a)(5–7) (defining wine, distilled spirits, and malt beverages).

39.     Section 105(e) of the FAA Act gives TTB the authority to issue regulations that provide consumers with "adequate information" as to the identity and quality of the product and prohibit false or misleading statements.

40.     The FAA Act's legislative history sheds insight on the purpose of these labeling provisions. Congress stated that the law was "intended to [e]nsure that the purchaser should get what he thought he was getting . . . that he should be told what was in the bottle, and all the important factors which were of interest to him about what was in the bottle." *See* 72 Fed. Reg. 41,860, 41,863 (July 31, 2007) (quoting Hearings on H.R. 8539 before the Committee on Ways and Means, House of Representatives, 74th Cong., 1st Sess. 10 (1935)).

41.     The FAA Act also contains explicit statutory requirements with respect to alcohol content disclosures. The Act states that covered alcoholic beverages must:

> provide the consumer with adequate information as to . . . the alcoholic content thereof (except that statements of . . . alcoholic content of malt beverages are prohibited unless required by State law and except that, in case of wines, statements of alcoholic content shall be required only for wines containing more than 14 per centum of alcohol by volume).

*See* 27 U.S.C. § 205(e).

42.     Although this language contains some limitations, for two reasons, TTB has stated that it has the authority to require alcohol labeling on all wines, distilled spirits, and malt beverages.

43.     First, the IRC likewise provides TTB with authority to issue labeling regulations for distilled spirits, wines, and beers. *See, e.g.*, 26 U.S.C. §§ 5301, 5368, 5412. Insofar as

relevant, TTB has interpreted that labeling authority as permitting it to require alcohol content disclosure on wines containing less than 14 percent ABV. 72 Fed. Reg. at 41,866.

44.     Second, although the FAA Act, as enacted, prohibits alcohol content disclosures on malt beverages unless required by state law, that prohibition was overturned by the Supreme Court on First Amendment grounds. *See Rubin v. Coors Brewing Company*, 514 U.S. 476 (1995). TTB has since interpreted the FAA Act as leaving the Treasury Department "with authority to either allow or require alcohol content statements on malt beverage labels." *See* 72 Fed. Reg. at 41,865.

## II.     FDA's Authority under the FDCA

45.     FDA has regulatory authority over alcoholic beverages under its broad authority to regulate "foods" pursuant to the FDCA. 21 U.S.C. § 321(f).

46.     Because FDA's and TTB's authority overlap, in 1976, the two agencies reached an agreement that TTB is responsible for the labeling of alcoholic beverages covered by the FAA Act, while FDA is responsible for the labeling of those not covered by the FAA Act.

47.     Alcoholic beverages within FDA's jurisdiction must comply with the labeling requirements of the FDCA, including the ingredient and nutrition labeling requirements.

48.     Certain beers, hard ciders, and hard seltzers do not meet the definitions of "distilled spirits, wines, and malt beverage products" under the FAA Act and, therefore, are subject to the FDCA. FDA, Labeling of Certain Beers Subject to the Labeling Jurisdiction of the Food and Drug Administration: Guidance for Industry at 3–4 (2014), https://www.fda.gov/media/90473/download.

49.     In addition to product labeling, the FDCA contains certain menu labeling requirements for alcoholic beverages. In 2010, the Patient Protection and Affordable Care Act

("ACA") amended the FDCA to require certain chain restaurants to provide nutrition information to customers. *See* 21 U.S.C. § 343(q)(5)(H). FDA interprets these requirements as applying to all alcoholic beverages. FDA, Menu Labeling: Supplemental Guidance for Industry at 40–41 (May 2018), https://www.fda.gov/media/108737/download.

### III.     Inadequate and Inconsistent Current Alcohol Labeling Environment

50.     This overlapping authority, and Defendants' failure to mandate a comprehensive labeling regime, has resulted in wildly inconsistent labeling requirements for nearly identical (or, in some cases, identical) products.

51.     To take just one example, a beverage called "Truly Hard Seltzer," which is 5 percent ABV and made by the Boston Beer Company, contains a Nutrition Facts panel, as required by the FDCA. Consumers who purchase that product are able to learn from its label its ingredients and that it contains 100 calories.

52.     This is basic information that most consumers have come to expect when purchasing a product, but it is critical information for Plaintiffs' members and supporters, such as Drs. Miller and Carlson, who need to monitor nutrition and/or ingredient information for their health.

53.     But, a bottle of a malt beverage called "Samuel Adams Boston Lager," which is also 5 percent ABV and also made by the Boston Beer Company, is regulated by TTB. Because, as discussed below, TTB does not mandate calorie or ingredient labeling for malt beverages, Samuel Adams Boston Lager is not required to, and does not, contain a calorie or ingredient disclosure.

54.     More baffling still, the *same bottle* of Samuel Adams Boston Lager, when sold at a chain restaurant instead of a liquor store, is required to have calorie information because of the ACA's menu labeling requirements that apply to all alcohol.

55.     One thing *is* consistent about the labeling rules applicable to Truly Hard Seltzer and Samuel Adams Boston Lager, whether purchased from a store or restaurant: no alcohol content disclosure is required. *See* 21 C.F.R. § 7.63(a)(3) (requiring alcohol content disclosures only on malt beverages that derive alcohol from certain flavors and added ingredients); TTB, "Hard Seltzers" What are the TTB Rules? at 7 (Sept. 9, 2021), https://bit.ly/3AsC5S9 (no alcohol labeling requirements for hard seltzers falling outside TTB jurisdiction).

**FACTUAL BACKGROUND**

**I.     The Public Health Importance of Alcohol Labeling**

56.     Enhanced transparency in alcohol labeling has the potential to generate economic and social benefits by helping to: (a) prevent the inadvertent overconsumption of alcohol; (b) reduce calorie intake from alcohol; and (c) allow consumers to make safe and informed choices about the alcoholic products they purchase.

57.     As the Treasury Department has noted, alcohol "labeling could be an effective means of conveying information relevant to health concerns (for example, calorie content and more detail about alcohol content) to consumers" and "ensuring consumers are informed about the nature of alcohol beverages promotes public health goals." Treasury Report at 47–48.

58.     Alcohol misuse or excessive alcohol intake increase the risk of several conditions, including liver disease, cardiovascular disease, injuries, and alcohol use disorders. U.S. Dep't

11

Agriculture & U.S. Dep't of Health and Human Services, Dietary Guidelines for Americans ("DGA") 2020–2025 at ch.1, p. 49 (2020), https://bit.ly/3hWetME.[1]

59.     Even drinking within recommended limits may increase the overall risk of mortality from several types of cancer and some forms of cardiovascular disease. *Id.*

60.     According to the Centers for Disease Control and Prevention ("CDC"), more than 140,000 lives are lost in the United States each year to alcohol-related causes, and the latest data show that rates of alcohol-induced mortality are on the rise. CDC, *Deaths from Excessive Alcohol Use in the U.S.* (updated July 6, 2022), https://bit.ly/36Uzb9q; Susan Spillane *et al.*, *Trends in Alcohol-Induced Deaths in the United States, 2000-2016*, 3 JAMA Network Open 1 (Feb. 21, 2020).

61.     In addition to alcohol-related death and disease, the United States is also facing daunting rates of cardiovascular disease, type 2 diabetes, and cancer, for which obesity is a top risk factor. *See* Nat'l Insts. of Health, *Overweight and Obesity*, https://bit.ly/3AvMz3t.

62.     Results from the 2017-2018 National Health and Nutrition Examination Survey ("NHANES") show that 43% of U.S. adults have obesity and an additional 31% have overweight. Cheryl Fryar *et al.*, Prevalence of Overweight, Obesity, and Severe Obesity Among Adults Aged 20 and Over: United States, 1960–1962 Through 2017–2018 (Dec. 2020), https://bit.ly/2Wbk75a.

63.     Obesity results, in part, from an energy imbalance produced by excess calorie intake. *See* Nat'l Insts. of Health, *Overweight and Obesity*.

---

[1] The DGA is jointly published by the Department of Health and Human Services and the U.S. Department of Agriculture every five years and provides evidence-based food and beverage advice for Americans.

64.     On average, alcoholic beverages account for approximately 9 percent of calories among those who drink and, according to the CDC, almost 20 percent of men and 6 percent of women consume more than 300 calories from alcoholic beverages per day (or roughly 15 percent of a day's calories). *See* DGA 2020–2025 at ch.1, p. 49; Joy Nielsen *et al.*, Calories Consumed from Alcoholic Beverages by U.S. Adults, 2007-2010 (Nov. 2012), https://bit.ly/3eKDLeu; FDA, *How to Understand and Use the Nutrition Facts Label* (Feb. 2022), https://bit.ly/3f61mJE (noting that 2,000 calories a day is used for general nutrition advice, but that calories needs vary based on various factors). Reducing energy intake from alcoholic beverages provides an important opportunity to reduce the burden of obesity and related disease.

65.     To "help Americans move toward a healthy dietary pattern and minimize risks associated with drinking," the 2020–2025 DGA recommends that adults who choose to drink alcoholic beverages should limit intake to two drinks or less in a day for men and one drink or less in a day for women (on the days in which alcohol is consumed). *See* DGA 2020-2025 at ch.1, p. 49.[2]

66.     The DGA also notes that "alcohol and calories in beverages varies" and recommends that such alcohol and calories "should be accounted for within the limits of healthy dietary patterns, so that calorie limits are not exceeded." *Id.*

67.     Yet, current alcohol labeling requirements fail to provide the information that would allow consumers to move toward a healthier diet or minimize risks associated with drinking.

---

[2] Under the DGA recommendations, a drink is defined as 14 grams (0.6 fl. oz.) of pure alcohol, equal to 12 fl. oz. of regular beer (5% alcohol), 5 fl. oz. of wine (12% alcohol), or 1.5 fl. oz. of 80 proof distilled spirits (40% alcohol). *Id.*

68.     In addition to alcohol content and calorie information, consumers need information on the ingredients in alcoholic beverages. Ingredient information is particularly important for consumers that for health, safety, religious, or other reasons need to avoid certain ingredients, including the millions of Americans and Plaintiffs' members and supporters, like Drs. Miller and Carlson, with food allergies. *See* Ruchi S. Gupta *et al.*, *Prevalence and Severity of Food Allergies Among US Adults*, JAMA Network Open (Jan. 4, 2019).

69.     Again, current alcohol labeling requirements fail to provide consumers with this essential information.

## II.     The Petition

70.     On December 16, 2003, Plaintiffs, 66 other organizations, and eight individuals petitioned TTB to fix this flawed system. *See* Petition.

71.     The Petition requested that the agency mandate an "Alcohol Facts" label on alcoholic beverages containing the following information: (a) ABV; (b) serving size; (c) amount of alcohol per serving; (d) number of calories per serving; (e) ingredients (including allergens); (f) number of standard drinks per container; and (g) the DGA's advice on moderate drinking.

72.     The Petition suggested the following example Alcohol Facts label for a 750ml bottle of wine. *See* Image 1.

**Image 1**



14

**III.     TTB's Proposed, but Never Finalized, Mandatory Alcohol Labeling**

73.     On April 29, 2005, in response to the Petition, TTB published an advanced notice of proposed rulemaking requesting public comment on mandatory alcohol, nutrition, ingredients, and allergen labeling on alcoholic beverages. 70 Fed. Reg. at 22,274.

74.     TTB received over 19,000 comments in response to its request from a wide range of stakeholders. 72 Fed. Reg. at 41,863.

75.     Following public comment, on July 26, 2006, TTB published a notice of proposed rulemaking on allergen labeling for alcoholic beverages, 71 Fed. Reg. 42,329 (July 26, 2006) ("Allergen Labeling Proposal"), and on July 31, 2007, TTB published a notice of proposed rulemaking on alcohol and nutrition labeling for alcoholic beverages, 72 Fed. Reg. 41,860 (July 31, 2007) ("Serving Facts Proposal") (collectively, the Allergen Labeling Proposal and Serving Facts Proposal are referred to as "Proposals").

76.     In the Allergen Labeling Proposal, TTB proposed requiring alcoholic beverages to clearly declare the presence of eight major food allergens—milk, eggs, fish, shellfish, tree nuts, peanuts, wheat, and soybeans—similar to what is required for packaged foods under the Food Allergy Labeling and Consumer Protect Act. 71 Fed. Reg. at 42,337. Beginning January 2023, packaged food will also be required to list sesame. *See* FDA, *Food Allergies* (June 23, 2022), https://bit.ly/3BCHkOD.

77.     While the Petition urged TTB to require an ingredient list that would, among other things, alert consumers to common allergens, TTB's proposal deferred consideration of broader ingredient labeling for a "later, additional rulemaking." *Id.* at 42,334.

78.     In the subsequent Serving Facts Proposal, TTB proposed a mandatory "Serving Facts" label and a mandatory alcohol percentage declaration. The "Serving Facts" panel would

contain the following information: (a) the serving size, (b) the number of servings per container,

(c) the number of calories per serving; and (d) the amount, in grams per serving, of

carbohydrates, fat, and protein. 72 Fed. Reg. at 41,860.

79.    TTB provided the following examples of the Serving Facts label, *see* Images 2–3,

displaying options depending on whether the manufacturer elected to place alcohol content on

the Serving Facts label or elsewhere on the package. *Id.* at 41,878.

**Image 2**

| Serving Facts | |
| --- | --- |
| Serving Size | 5 fl oz (148 ml) |
| Servings Per Container | 2 ½ |
| | Amt Per Serv. |
| **Calories** | 120 |
| **Carbohydrate** | 3g |
| **Fat** | 0g |
| **Protein** | 0g |

**Image 3**

| Serving Facts | |
| --- | --- |
| Serving Size | 1.5 fl oz (44 ml) |
| Servings Per Container | 17 |
| | Amount Per Serving |
| **Alcohol by volume** | 40% |
| fl oz of alcohol | 0.6 |
| **Calories** | 116 |
| **Carbohydrate** | 0g |
| **Fat** | 0g |
| **Protein** | 0g |

80.    Although there were important differences between TTB's Proposals and the

labeling changes sought in the Petition, if finalized, the Allergen Labeling Proposal and Serving

Facts Proposal would have gone a long way toward achieving Plaintiffs' goal of comprehensive,

uniform, and mandatory alcohol labeling. They certainly would have satisfied the requirement to

respond to the Petition.

81.     However, TTB never finalized either Proposal.

82.     With respect to the Allergen Labeling Proposal, TTB instead left consumers with an interim final rule, published on the same day as the Allergen Labeling Proposal, that permits *voluntary* disclosure of major allergens and sets forth certain standards for such voluntary disclosures. 71 Fed. Reg. 42,260 (July 26, 2006). The sixteen-years that have lapsed without finalizing the Allergen Labeling Proposal is all the more surprising and disappointing considering that, in the Proposal, TTB noted that the "major trade associations representing the alcohol beverage industry expressed their support for mandatory labeling of major food allergens." 71 Fed. Reg. at 42,332.

83.     Similarly, TTB has allowed the Serving Facts Proposal to languish. TTB's most recent action was on May 28, 2013, when it issued a ruling permitting *voluntary* use of a Serving Facts label similar to the mandatory one contained in its 2007 proposal "pending the completion" of the proposed rule. *See* TTB Ruling 2013-2, https://bit.ly/3wK8Wjk. Yet, over nine years have lapsed without TTB finalizing the Serving Facts Proposal.

84.     In other words, rather than mandate disclosure of allergy, alcohol, and nutrition information, TTB left it up to industry to decide what to disclose—and what to keep hidden.

**IV.     Recent Activities**

85.     On February 2019 and February 2021, Plaintiffs wrote to the Treasury Department again urging it to require alcohol labeling. CSPI *et al.*, *In re: TTB Notice 176, 83 Fed. Reg. 60562* (Feb. 22, 2019), https://bit.ly/3wYiZhR; CSPI *et al.*, *Request for Leadership on Improving Alcohol Labeling to Protect Public Health* (Feb. 24, 2021), https://bit.ly/3QAOl8V.

86.     In February 2022, the Treasury Department, in consultation with the U.S. Department of Justice and the Federal Trade Commission, released the Treasury Report, a report on competition in the markets for beer, wine, and spirits.

87.     In the Treasury Report, Treasury found that it was a "matter[] of concern" that "[r]egulatory proposals that could serve public health and foster competition by providing information to consumers, such as mandatory allergen, nutrition, and ingredient labeling proposals, have not been implemented." Treasury Report at 2–3.

88.     The Treasury Report concluded with a recommendation that "**TTB should revive or initiate rulemaking proposing ingredient labeling and mandatory information on alcohol content, nutritional content, and appropriate serving sizes.**" *Id.* at 61 (emphasis in original).

89.     In the U.S. House of Representatives Appropriations Committee Report accompanying the Fiscal Year (FY) 2023 Financial Services and General Government Appropriations Bill, the Appropriations Committee cited the Treasury Report and "encourage[d] TTB to implement this recommendation and initiate rulemaking to require a uniform 'alcohol facts label' on alcoholic beverages with appropriate information to ensure consumers have access to complete and standardized labeling information on beer, wine, and distilled spirits, including the amount of alcohol per serving." H.R. Rep. No. 117-393 at 24 (June 28, 2022), https://bit.ly/3RlT8uW. The Committee Report noted that TTB had "yet to finalize a 2007 proposed rule" on alcohol labeling. *Id*.

90.     The U.S. Senate Committee on Appropriations similarly urged TTB to adopt "complete and standardized" alcohol labeling. *See* U.S. Senate Committee on Appropriations,

Explanatory Statement for Financial Services and General Government Appropriations Bill,

2023 at 15 (July 28, 2022), https://bit.ly/3psJSJB.

91.     Despite this interest by the Treasury Department and Congress in alcohol

labeling, and although nearly 19 years have passed since Plaintiffs filed the Petition, TTB has

neither granted nor denied the Petition and Defendants have failed to take significant action to

address this urgent public health and consumer protection matter.

## CLAIM FOR RELIEF

92.     Plaintiffs incorporate by reference and re-allege all allegations set forth in the

proceeding paragraphs.

93.     The Administrative Procedure Act ("APA") requires that an agency "shall . . .

conclude a matter presented to it" "within a reasonable time," 5 U.S.C. § 555(b), and the

reviewing court "shall . . . compel agency action . . . unreasonably delayed," *id.* § 706(1).

94.     Nearly 19 years have passed since Plaintiffs filed the Petition, yet Defendants

failed to issue a final decision granting or denying the Petition.

95.     As a result, Plaintiffs' members and supporters and the public at large have for

years been forced to purchase alcoholic beverages without knowing important diet, health, and

safety information or possibly forgo them.

96.     Defendants have provided no public justification for their failure to act on this

urgent public health problem. Defendants' years-long delay in issuing a decision on the Petition

is unreasonable, violates the APA, and warrants relief from this Court. 5 U.S.C. §§ 555(b),

706(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.      Declare that Defendants' failure to act on the Petition constitutes "unreasonabl[e] delay[]" in violation of the APA, 5 U.S.C. §§ 555(b), 706(1);

B.      Order Defendants to issue a final decision on all relief requested in the Petition within 60 days of the Court's order;

C.      Award Plaintiffs' reasonable attorneys' fees and costs under 28 U.S.C. § 2412; and

D.      Grant such further relief as this Court may deem just and proper.

Date: October 3, 2022                              Respectfully submitted,


By:     /s/ *Lisa S. Mankofsky*
        Lisa S. Mankofsky (D.C. Bar No. 411931)
        CENTER FOR SCIENCE IN THE PUBLIC
        INTEREST
        1250 I Street, NW, Suite 500
        Washington, DC 20005
        Telephone: (202) 777-8381
        Email: lmankofsky@cspinet.org

        Matthew Simon (D.C. Bar No. 144727)
        *Application for Admission Pending*
        CENTER FOR SCIENCE IN THE PUBLIC
        INTEREST
        106 Riding Trail Lane
        Pittsburgh, PA 15215
        Telephone: (202) 777-8361
        Email: msimon@cspinet.org

        *Counsel for Plaintiffs*